**AMERICAN TELEPHONE
& TELEGRAPH CO.,**
Plaintiff,

v.

**EASTERN PAY PHONES, INC.,
et al., Defendants.**

Civ. A. No. 3:90CV00646.

United States District Court,
E.D. Virginia,
Richmond Division.

June 20, 1991.

Alan Durrum Wingfield, David Gant Shuford, Mays and Valentine, Richmond, Va., for American Tel. & Tel. Co.

Marshall Howard Ross, Mitchell F. Brecher, Dow, Lohnes & Albertson, Washington, D.C., for Eastern Pay Phones, Inc.

John Henry OBrion, Jr., Cowan & Owen, P.C., Richmond, Va., for Chesapeake and Potomac Co. of Virginia.

Kevin T. Baine, Mark S. Levinstein, Victoria L. Radd, Robert J. Shaughnessy, Williams & Connolly, Washington D.C., for Chesapeake and Potomac Co.

Warner F. Brundage, Jr., C & P Telephone Co. of VA, Richmond, Va., for Chesapeake and Potomac Co. of Maryland.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on motions of Plaintiff American Telephone and Telegraph ("AT & T") and Third–Party Defendants, the Chesapeake and Potomac Telephone Companies ("C & P") to dismiss the counterclaim and third party complaint

filed by Defendant Eastern Pay Phones, Inc. ("Eastern").

## I. FACTS

Eastern Pay Phones is a private pay telephone company doing business in Virginia, Maryland, and the District of Columbia. Eastern owns and operates instrument-implemented ("smart") pay phones. These phones utilize circuitry to count coins or verify call charging information. The phones are connected to standard C & P business telephone lines, which provide local service and access to long distance carriers. Eastern has chosen MCI as its long distance carrier, although callers can access AT & T long distance from an Eastern Pay Phone.

Eastern is billed by C & P for local service. C & P also handles the billing for AT & T. This action arose when C & P billed Eastern for approximately $39,000 in AT & T long distance calls. Eastern claims that the calls were fraudulently made, and has refused to pay the bill.

In addition to denying liability for the calls, Eastern has filed a counterclaim against AT & T, claiming that AT & T has failed to provide blocking and screening of long distance calls originating at, or charged to, Eastern Pay Phones. The counterclaim alleges that: 1) AT & T is pursuing collection of fraudulent charges in an effort to punish Eastern for not selecting AT & T as their long distance carrier; 2) AT & T has approached property owners where Eastern phones are located, and unlawfully asked them to switch to AT & T; 3) AT & T has denied fraud protection and pursued collection in an effort to drive Eastern and other private pay phone operators out of business, leaving the pay phone market controlled by C & P and other Bell Operating Companies, who generally select AT & T for long distance calls.

Eastern has also filed a third party complaint against C & P alleging that C & P is responsible for the fraudulent charges because it has failed to provide Eastern with adequate anti-fraud devices. In particular, Eastern alleges that C & P has failed to provide a "coin line" in addition to the standard phone line. A "coin line" provides central office control over pay phone operations and is allegedly required to defeat certain types of fraud. All of C & P's pay phones utilize a coin line and are central-office-implemented ("dumb"). Eastern alleges that fraud threatens Eastern's survival and that of the private pay phone industry.

Finally, Eastern claims that C & P has engaged in numerous other anti-competitive activities, such as raising pay phone commissions, imposing onerous termination penalties, denying consolidated billing, and making Eastern pay phones unprofitable by saturating the area surrounding Eastern's phone with C & P pay phones, regardless of the cost to C & P. Eastern alleges that C & P undertook these activities in an attempt to drive Eastern out of business and increase C & P's market share.

In considering a motion to dismiss, Eastern's allegations and their reasonable inferences must be taken as true. *See Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976). Dismissal is only appropriate if Eastern is "entitled to no relief under any state of facts which could be proven to support its claim." *Advanced Health–Care Services, Inc. v. Radford Community Hosp.*, 910 F.2d 139, 143–144 (4th Cir.1990).

## II. COUNTERCLAIM AGAINST AT & T

### A. *Antitrust Counts*

#### 1. Standing

■ AT & T argues that Eastern lacks standing to claim a violation of the antitrust laws. First, AT & T claims that Eastern has failed to show a causal connection between AT & T's conduct and antitrust injury. However, Eastern alleges that denial of blocking and screening is an effort to drive non-AT & T subscribing pay phones out of business. Eastern's injury is a result of AT & T's failure to provide anti-fraud protection, therefore Eastern's injury was directly caused by AT & T's anti-competitive conduct.

Because the alleged aim of AT & T's conduct was the elimination of Eastern and other private pay phone companies, the injury suffered is cognizable under the antitrust laws. AT & T's denial of fraud protection is analogous to the denial of reimbursement to the psychologists in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Here, assuming Eastern's allegations to be true, AT & T engaged in a series of anticompetitive efforts which had the effect of increasing Eastern's price and tending to drive Eastern and others out of the pay phone market. *See* Counterclaim, Paragraph 33. This constitutes antitrust injury.

■ AT & T next argues that Eastern has no standing because it is neither a competitor or customer of AT & T. However, Eastern is a potential customer if AT & T successfully monopolizes the long distance market. Therefore Eastern has a direct interest in competition in the long distance market.

AT & T's reliance on *Associated General Contractors Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) is misplaced. In *Associated,* the Supreme Court found that it was unclear whether the union plaintiff would be benefitted by competition. They therefore concluded that the union was "not part of the class the Sherman act was designed to protect." 459 U.S. at 540, 103 S.Ct. at 909. In contrast, Eastern has a direct interest in vigorous competition in the long distance market. The injury Eastern alleges is "inextricably intertwined" with the injury that AT & T sought to inflict on its long distance competitors. This injury, like the injury in *McCready,* falls within the area that Congress intended to protect under the antitrust laws. AT & T's argument that Eastern's injury was speculative and indirect must also fail. Eastern bore the brunt of AT & T's conduct. Eastern's damages will be determined by the charges for preventable fraudulent calls. Such damages will not be unduly speculative.

2. Monopolization and Attempted Monopolization

■ AT & T argues that Eastern has failed to sufficiently allege possession of monopoly power and willful use of that power for anti-competitive purposes. However, the counterclaim states that AT & T accounts for more than two-thirds of the pay-telephone long distance market. This market share is sufficient to defeat AT & T's motion to dismiss. *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 925 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

AT & T's alleged conduct is exclusionary because it injures private pay phone companies who do not choose AT & T for long distance. Eastern should be given an opportunity to show that AT & T's conduct was "a deliberate effort to discourage its customers from doing business with its smaller rival." *Advanced Health–Care Services, Inc. v. Radford Community Hospital,* 910 F.2d 139, 149 (4th Cir.1990). AT & T's conduct in soliciting premises owners, and failing to block and screen fraudulent calls, could reasonably be deemed exclusionary.

Eastern has alleged the necessary elements to support its attempted monopolization claim. In addition to the existence of monopoly power and exclusionary conduct, the counterclaim alleges specific intent to monopolize. These allegations are sufficient to withstand AT & T's motion to dismiss.

*B. Common–Law Counts*

1. Tortious Interference

■ Count 11 of the counterclaim alleges tortious interference under Virginia, Maryland, and D.C. law. Eastern correctly cites the elements of tortious interference in Virginia. Defendant's Brief in Opposition to AT & T's Motion to Dismiss, page 39 (citing *Chaves v. Johnson,* 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985)). Under *Chaves,* Eastern must show "interference inducing or causing a breach or termination of the relationship or expectancy." 335 S.E.2d at 102.

■ Eastern has failed to allege that its contract with MCI or any other party was breached or terminated. Although Eastern claims a business expectancy in continuing to do business, this is not the type of expectancy protected by Virginia law. Instead, there must be a particular expectancy which it is reasonably certain will be realized. *See, e.g., Glass v. Glass,* 228 Va. 39, 321 S.E.2d 69 (1984). The expectancy of remaining in business is too general to support a tortious interference claim under Virginia law.

■ Since the Maryland and District of Columbia laws of tortious interference with contractual relationships are substantially the same as the law in Virginia, count 11 fails to state a claim. Maryland's law of interference with prospective advantage is similar to the law of interference with contractual relations. *See* Prosser, *Torts* 952 (4th ed. 1971). The "prospective advantage" protected is generally future contractual relations. Prosser at 950. Eastern has failed to show any particularized future contract with has been lost due to AT & T's actions. Therefore Eastern has failed to state a claim for tortious interference under Virginia, Maryland, or D.C. law. Count 11 will be DISMISSED.

### 2. Duty of Care

■ Count 12 alleges that AT & T breached a duty of care by failing to provide Eastern with fraud protection. However, Eastern has failed to establish that AT & T owed Eastern any duty of care. Eastern admits that there is no contractual or special relationship between Eastern and AT & T. Instead, Eastern argues that AT & T's position as a monopolist imposes a duty. The cases cited by Eastern do not support this position. Although a monopolist may, under certain circumstances, owe a duty to aid competitors, this duty does not imply a general duty of care.

■ Eastern also argues that this Court should impose a duty of care based upon Eastern's dependence upon AT & T. However, such a duty would be far too sweeping. A duty will generally only be created in the case of privity or a special relationship. *See generally* Prosser § 89 at 145–58. Eastern has already alleged as an affirmative defense that it is not responsible for fraudulent calls made through AT & T. The propriety of AT & T's charges is best determined on the merits of this case, rather than by imposing a duty of care upon AT & T.

Eastern has failed to demonstrate that AT & T owes any general duty of care, and the Court declines to create such a duty. Count 12 will therefore be dismissed.

## III. THIRD–PARTY COMPLAINT AGAINST C & P

### A. Antitrust Immunity

Eastern's third-party complaint against C & P alleges that C & P has failed to take various actions to prevent fraudulent use of private pay phones. C & P's motion to dismiss focuses almost exclusively on the denial of a "coin line."

### 1. STATE ACTION IMMUNITY

■ C & P contends that its refusal to provide Eastern with a coin line resulted from state regulatory control. C & P argues that the Federal Communications Commission ("FCC") only permits local exchange companies, like C & P, to provide private pay phones with "business" lines, as opposed to "coin" lines. C & P contends that Virginia, Maryland, and D.C. have followed the FCC's lead in regulating private pay phone service. C & P contends that this regulation creates antitrust immunity under the state action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Supreme Court drew a clear distinction between direct state action and action taken by a regulated industry. The Court rejected the argument that "public interest" regulation should be immune from antitrust scrutiny. The Court found no "inconsistency between requiring [a public utility] to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with

antitrust standards to the extent that it engages in business activity in competitive areas of the economy." *Id.* at 596, 96 S.Ct. at 3120. The Court then found that the distribution of light bulbs by Detroit Edison was not "necessary to make the regulatory Act work," and therefore stuck down Detroit Edison's practice. *Id.* at 597, 96 S.Ct. at 3121.

▮ The test for state action immunity was articulated in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). Under the *"Midcal"* test, a practice is given antitrust immunity if it is the product of a clearly articulated and affirmatively expressed state policy which is actively supervised by the state itself. In *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), the Supreme Court considered the propriety of immunity where state policy explicitly permits, but does not compel, anticompetitive conduct. The Court concluded that "[a]s long as the State clearly articulates its intent to adopt a permissive policy, the first prong of the Midcal test is satisfied." *Id.* at 60, 105 S.Ct. at 1728.

Although C & P contends that Virginia, Maryland and D.C. have clearly permitted denial of a "coin line," the record does not support this contention.

### a. *Virginia*

In Virginia, while it is clear that telephone company service is a regulated industry, and the State Corporation Commission ("SCC") regulates pay phones, there is no clear policy concerning "coin lines" or their equivalent. Indeed, the SCC Interim rules governing customer-owned coin-operated telephones ("COCOTs") neither require or prohibit the provision of a "coin line" or similar line. Although the SCC regulations fix rates, and describe the COCOT service as a "business service," they do not dictate the type of line to be provided.

Although C & P goes to considerable length to argue that various SCC rules and regulations have the effect of sanctioning denial of a coin line, nothing approaches a clear intention to displace competition. There must be a "clearly articulated policy of the State itself, such as a policy approved by a state legislature ..." *Southern Motor Carriers,* 471 U.S. at 63, 105 S.Ct. at 1730.

C & P points to the fact that Eastern and other private pay phone companies have asked the SCC to require provision of coin lines. However, these actions do not imply that the SCC has a clearly articulated policy. Indeed, the record as a whole reveals no clear SCC policy on the provision of coin lines. Under *Southern Motor Carriers,* the state must knowingly sanction and permit an anti-competitive practice. There is no evidence that Virginia has considered the antitrust implications of denial of a "coin line" or similar service.

### b. *Maryland*

Maryland's Public Service Commission ("PSC") functions much like the Virginia SCC in regulating phone service. Although the PSC states that the service for COCOTs is "a type of business tone line," no regulation explicitly permits or prohibits the provision of a coin line. Under the PSC regulations, C & P appears free to provide a "coin" or similar type of line in addition to a business dial tone. There are no documents or regulatory history which indicate that the PSC has considered the anticompetitive effects of denial of a "coin" line.

### c. *District of Columbia*

The District of Columbia has a regulatory structure similar to that found in Virginia and Maryland. Much like the rules established in those states, the District tariff sets the rate for a business line and is silent concerning a "coin" line.

### d. *Conclusion*

The state action doctrine balances the principles of federalism and free competition. Under *Parker,* a state may displace competition by taking clear and definitive action. *Southern Motor Carriers* allowed states to *permit* anti-competitive activity by regulated industries, if the activity is pursuant to a clear state policy to displace competition.

Although all three jurisdictions regulate the public telephone industry, this does not dispose of the issue. The record reveals no discussion of "coin lines" by the legislature of any of the three jurisdictions. Although the regulations governing pay phones could possibly be interpreted to sanction or compel the denial of coin lines, there is no clear expression of state policy. The Court will not infer or imply a prohibition of coin lines where the regulatory provisions are unclear.

It is significant that the terms "coin line" and "central-office implemented" are wholly absent from the regulatory materials. There can be no "clearly articulated policy" when the relevant terms are not even mentioned. Instead, a more plausible interpretation is that these states remain neutral concerning provision of a coin line. State neutrality does not confer immunity.

Immunity is premised upon deference to state displacement of competition. C & P presents no evidence that Virginia, Maryland or the District have made a policy decision that provision of coin lines to private pay phones is contrary to the state or public interest. In the absence of a clear state policy, the Court will scrutinize private conduct to determine compliance with the directives of the antitrust laws.[1]

### 2. FCC Action Immunity

■ C & P contends that the FCC has prohibited the provision of coin lines to private pay phone companies, and that antitrust immunity should be implied. Although it is true that the FCC only permits registration of instrument-implemented or "smart" pay phones, there is no "plain repugnancy" between this position and imposition of antitrust liability.

First, the FCC does not prohibit registration of "smart" phones which *also* utilize a "coin" line to prevent fraud. Second, the FCC's policy concerning coin lines is not statutorily required or imbedded in their rate structure. These FCC regulations govern Eastern, not C & P. C & P cannot make the claim that its potentially anti-competitive conduct has been explicitly permitted or required by the FCC.

Even the cases cited by C & P in support of immunity actually support Eastern's position. For example, in *Phonetele, Inc. v. American Tel. & Tel. Co.*, 664 F.2d 716, 731–32 (9th Cir.1981), *cert. denied*, 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983), the Ninth Circuit outlined three requirements for implied immunity. These are: 1) explicit congressional approval of the ultimate anti-competitive effect of the challenged conduct; 2) explicit congressional authorization to the agency to order the challenged anti-competitive conduct; and 3) no inconsistency between the challenged conduct and an express policy of the agency.

At minimum, the first two elements of this test are not present here. Congress has never approved the denial of coin line service to private pay phone companies. Nor has the position of the FCC, if it could be construed as prohibiting the provision of a coin line, been congressionally authorized. Therefore there is no implied immunity. *See Northeastern Tel. Co. v. American Tel. & Tel.*, 651 F.2d 76 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

C & P has simply failed to show any congressional or regulatory policy concerning the provision of coin lines to prevent fraud. While the FCC decided not to *require* C & P to offer the coin line separately in *Tonka Tools*, the FCC has never *prohibited* the provision of a coin line—either in conjunction with a business line or standing alone. The existence of petitions asking that the FCC require the provision of coin lines hardly establishes that provision of coin lines is now prohibited.

C & P's exhaustive review of the history of pay phone regulation reveals only that the FCC has historically treated the coin line and the connected "dumb" phone as part of the local exchange service. Eastern alleges that C & P's refusal to provide protection against fraud violates the anti-

---

1. Having determined that C & P has failed the first prong of the *Midcal* test, it is unnecessary to determine whether the state supervision is sufficiently "active."

trust laws. These claims directly involve C & P's provision of the local exchange service. Even conceding that the coin line is part of the local exchange, denial of this service is not entitled to antitrust immunity. Nothing in the Federal Communications Act or the FCC regulations prohibits the provision of anti-fraud devices, including a coin line.

## B. Primary Jurisdiction

### 1. Antitrust Claims

■■■ As an alternative to antitrust immunity, C & P contends that the Court should defer to the FCC pursuant to the doctrine of primary jurisdiction. The invocation of primary jurisdiction depends upon the nature of the claim involved, and the impact that the case will have upon the regulatory body. The Court will also considers pragmatic factors. Primary jurisdiction is to be invoked reluctantly and sparingly, since it delays the ultimate resolution of an issue. *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984).

The complaint alleges a variety of anti-competitive activities. Antitrust concerns are within the usual province of the Court and require no special regulatory expertise. This is especially true in the case of the FCC, for the Supreme Court has held that "courts retain jurisdiction to pass on alleged antitrust violation irrespective of [Federal Communications] Commission action." *United States v. Radio Corp. of America*, 358 U.S. 334, 343–44, 79 S.Ct. 457, 463, 3 L.Ed.2d 354 (1959). The facts of this case weigh against the invocation of primary jurisdiction with respect to the antitrust counts.

### 2. Communications Act

■■■ The application of primary jurisdiction in the context of the Communications Act was carefully analyzed in *In re Long Distance Telecommunication Litig.*, 612 F.Supp. 892 (E.D.Mich.1985), *aff'd in part*, 831 F.2d 627, 631 (6th Cir.1987). There the Sixth Circuit held that "[t]he district court was clearly correct that the claims based on section 201(b) of the Communications Act are within the primary jurisdiction of the FCC." The Court noted that the FCC pervasively regulated the long distance market, and that review of the challenged practices was underway at the FCC.

The FCC currently has a complaint pending which charges that AT & T and C & P acted in violation of § 201(b) by charging fraudulently placed calls to a private pay phone company. *Scioville v. American Tel. & Tel. Co. and Chesapeake & Potomac Tel. Co.*, received by the FCC on January 25, 1991. *Scioville* alleges that AT & T and C & P failed to provide fraud prevention to pay phones in Virginia and D.C. The facts recited in *Scioville* are essentially similar to those present here. The FCC should be given the first opportunity to assess this type of conduct under § 201(b) of the Communications Act. Therefore, Counts 9 and 10 will be STAYED, pending disposition by the FCC.[2] The Court will proceed to trial on the remaining counts in this matter, without awaiting the decision of the FCC on counts 9 and 10.

## C. State Utility Counts

■■■ C & P contends that Counts 11, 12, and 13, which alleges violations of state public utility laws, fall within the exclusive jurisdiction of the state regulatory commissions. As Eastern concedes, state-agency "exclusive jurisdiction" is analogous to the FCC's primary jurisdiction. *See* 5 J. Stein, G. Mitchell & B. Mezines, Administrative Law § 47.01[1] (1988).

For the same reasons that deference to the FCC concerning the Communications Act was proper, the Court FINDS it appropriate to allow the state regulatory agencies to first interpret the laws which gov-

---

**2.** The Court notes that the evidence on the antitrust counts necessarily overlaps the evidence relevant to the Communications Act counts. Thus, there will be some waste of judicial resources if these facts are submitted simultaneously to the FCC and this Court. None-theless, considerations of primary jurisdiction and the special expertise of the FCC in this area justify this course of action. Under this scheme, the Court will have the benefit of the FCC's assessment of C & P's actions under the Communications Act before ruling on this issue.

ern public utilities in Virginia, Maryland, and D.C. Since these claims arise under the Court's pendant jurisdiction, DISMISSAL of these counts is appropriate.

### D. Failure to State a Claim

#### 1. Antitrust Counts

C & P contends that the third-party complaint fails to alleges facts which state a claim under the antitrust laws. The Court FINDS that the allegations are sufficient to create a claim of monopolization under § 1 of the Sherman Act. In particular, Eastern has alleged facts which, if true, establish predatory conduct, monopoly leveraging, and denial of essential facilities. Eastern has also alleged antitrust injury, for reasons analogous to those discussed in Part I of this Memorandum Opinion.

The Court also FINDS that Eastern has alleged facts sufficient to state a claim of attempted monopolization in violation of Section 2. Finally, the Court FINDS Eastern's complaint sufficient under the analogous provisions of Virginia, Maryland, and D.C. law.

#### 2. Interference with Contract

Count 14 of the third-party complaint charges interference with contractual relationships. The complaint fails to allege with specificity any contract or expectancy that has been breached or lost. To the extent that Count 14 alleges a general expectancy of remaining in business, this claim has been addressed by Part I of this opinion.

To the extent that Eastern claims that *particular* contracts or expectancies with premise owners were breached or terminated, Eastern could state a valid claim for interference. Therefore, the Court will DISMISS this count WITHOUT PREJUDICE to Eastern's right to amend the third-party complaint by adding a count which states with particularity each relationship lost as a result of C & P's conduct.

#### 3. Duty of Care

Eastern's third party complaint alleges that there is a contractual relationship between C & P and Eastern. It is undisputed that C & P has a contractual duty to provide Eastern's "smart" pay phones with a business line. A contractual relationship gives rise to a duty of care in the performance of the contract. Therefore, Count 15 of the third party complaint is properly plead.

#### 4. Declaratory Relief

Since the antitrust and duty of care issue remain in the third-party complaint, the request for declaratory judgment is properly plead.

### IV. CONCLUSION

For the reasons stated, the Court will DISMISS Counts 11 and 12 of Eastern's Counterclaim against AT & T. The Court will also DISMISS Counts 11, 12, 13, and 14 of Eastern's Third–Party Complaint filed against C & P. Counts 9 and 10 of the third-party complaint will be STAYED, PENDING the decision of the FCC concerning the challenged conduct.